## HALSA *vs.* HALSA.

A father promised his son, that if he would remove to a piece of land belonging to, and near the residence of the former, he would give the land to his son. The son, at the time of the promise, had a family, and lived in a distant part of the country. He accepted the offer and removed to the land, and his father assigned to him the certificate of entry of the land, in these words: " I, Joseph Halsa, do *sine* the within certificate over to Amos Halsa, which is to empower him to lift the deed in his own name.—April 18th, 1835.—JOSEPH HALSA." *Held:*

1. That the assignment on the certificate was a sufficient note or memorandum to take the transaction out of the operation of the statute of frauds, and passed to the assignee an equitable right to the land.

2. That it was not necessary that the assignment should state the consideration of the transfer, for it is not necessary that the consideration of the agreement should be in writing, in order to take the transaction out of the operation of the statute of frauds.

3. That the removal of the son to the land, upon the faith of the promise made by his father, was a valuable consideration to support such assignment.

4. Benefit or advantage to the grantor is not the test of the value of a consideration. Inconvenience, trouble, or expense, borne by the grantee, will make the consideration as valuable in law as benefits conferred on the grantor.

5. Although it is well settled, that a purchaser with notice of the equity of another, from one who purchased without such notice, may protect himself under the first purchaser, yet if there are suspicious circumstances attending the purchases which are unexplained, and the answer of the first purchaser is evasive, and does not respond to all the material allegations in the bill, it may be inferred that the first purchaser was not a *bona fide* purchaser, and consequently that the second purchaser was not protected under the first.

6. It seems that a purchaser without notice, to be entitled to protection, must not only be so at the time of the contract or conveyance, but at the time of the payment of the purchase-money.

## APPEAL from the Chariton Circuit Court.

Jo. DAVIS, *for Appellants.*

Only two points are presented by the facts in this case:

1. Whether the removal of complainant from Livingston to Chariton county, upon the proposition of his father, that he would give him the land, form a valuable consideration, which, together with the meritorious consideration of blood between father and son, is sufficient in equity to entitle the son to a decree of title, as against his father, upon the assignment of the duplicate.

As to this point, see Littell's Select Cases, 22, 30, 77; 2 Story's Equity, 250; Pulvertoft *vs.* Pulvertoft, 18 Vesey, 99; Bunn *vs.* Winthrop, 1 Johns. C. Rep., 336, 7.

2. Whether the assignment of the duplicate to complainant, and his actual possession of and cultivation of the land, in pursuance of such assignment, was sufficient to put Heart and Parkes on inquiry as to the ownership of the land at the time they respectively purchased.

*Halsa* vs. *Halsa.*

As to this point, see Bartlett *vs.* Glascock, 4 Mo. Rep., 67; Knox *vs.* Thompson, 1 Littell, 350; Barbour *vs.* Whitlock, 4 Monroe, 196; 1 Story on Equity, 389.

In relation to the first point —

It is insisted for complainant, that a *gift* by a father to a son is not treated as other voluntary acts, where no relation exists. Blood is considered as a meritorious consideration in equity.—See the cases above referred to in Vesey and in Johns. C. Rep.

But in addition to this, here is a valuable consideration—the removal from Chariton to Livingston county.—See Allison *vs.* Congleton, Littell's Select Cases, 30, where the removal of a son-in-law was held a valid consideration. See, also, Pauling *vs.* Speed, in same book, p. 77, where blood was held a sufficient consideration for the assignment of a title-bond for land. See, also, the cases in same book, p. 22, of Leforce *vs.* Robinson.

In relation to the second point —

There is an abundance of evidence in the record to show that both Heart and Parkes had notice of the claim of complainant to the land, at the times they respectively purchased. A. Finnel proves, that Heart told him, that the old man Halsa was about to get five or six acres of the land from Amos for him, Heart, to cultivate; there is also proof that he lived in one mile of complainant for several years before he purchased, and that all the while complainant was cultivating this land. Littleton and Finnell both prove that Parkes knew of the assignment of the duplicate to Amos by his father.

CLARKE, *for Appellee.*

The points made and relied on by the appellee, to sustain the judgment of the Circuit Court, are—

1st. That the promise made, if at all, by the appellee, was a voluntary promise, without any *valuable* consideration, to be executed in future, and cannot be enforced. —6 Vesey, 606; 3 Marsh, 445; 5 Monroe, 408.

2d. That if there was such an assignment made as is alleged in the bill, it was but verbal, and cannot therefore be enforced.—1 Bibb, 203; 4 Bibb, 59; 3 Randolph, 238; 1 Sugden on Vendors, 130, 203, 189, 198, 190, 313–315.

3d. That, admitting the agreement made by the appellee with the appellant was binding as between them, yet a third party, who purchased without notice of complainant's claim, and the nature of it, cannot be affected by it.—Story's Equity, vol. i., pp. 75, 119, 120, 398, note, and the authorities there cited.

SCOTT, *Judge, delivered the opinion of the Court.*

This is a bill in chancery, filed by the appellant, complainant, against the defendants, appellees, in which it is represented that the complainant, in December, 1837, was residing in Livingston county, as now formed, in this State; that at the same time the defendant Halsa, his father, resided in Chariton county, in the possession of a considerable estate; that the complainant had just married, and

*Halsa* vs. *Halsa.*

was poor, and received about this time a proposal from his father, expressing his willingness to give him a tract of land near his residence if he would return; that he accepted the proposal, and in March, 1835, returned to his father, who, in compliance with his promise, put the complainant in possession of the tract of land, containing eighty acres, now in dispute, and assigned to him the certificate of entry, which was the evidence of the purchase of the land by his father from the United States. This occurred about the middle of April, 1835. The assignment of the certificate is in these words: "I, Joseph Halsa, do *sine* the within certificate over to Amos Halsa, which is to empower him to lift the deed in his own name.— April 18, 1835.— Joseph Halsa."

The certificate was delivered to the complainant, and he has retained it ever since; and he has since that time been in possession of the land, part of which has been cultivated by him. It was the belief, both of the complainant and his father, that the assignment of the certificate would enable the complainant to receive a patent for the land in his own name; that he accordingly applied for a patent, but was informed that it would issue in his father's name. He then applied to his father for a deed in January, 1836, but he declined making one; and in January, 1841, conveyed the land to Caleb Hart. It is charged, that Hart purchased with notice, and on being informed of the claim of the complainant to the land, he said he would risk it; that he well knew the complainant was in possession of the land, and cultivated part of the same. Hart, in four days after he purchased, conveyed to Peterson Parks. It is charged, that Parks had notice of the claim of the complainant, and was well apprized that he was in possession of the land, and that he cultivated a part of the same. The bill prays that the title to the land may be decreed to the complainant.

Joseph Halsa admits, in his answer, that in 1834, his son, the complainant, was residing in what is now known as Livingston county; that his son had just married and commenced the world, and was poor: he denies that he made a proposition to his son, that if he would return to Chariton he would give him a tract of land; but admits that, being desirous to promote his welfare, he informed him that if he would return he would assist him to purchase some land, and assist him in other respects, as much as he could, in justice to his other children. He admits his son returned to Chariton at the time stated in the bill. At his return, he directed his son to settle on the land in controversy, letting him know, at the same time, that if he conducted himself in such a manner as to merit his approbation, he might finally give him the land. Upon this, his son went upon the land, and, with his assistance, made a small improvement upon it. He admits he made the assignment of the certificate mentioned in the bill, but denies it was thereby intended to convey him any right. The object in making the assignment was, to enable the son to obtain the patent, who was then about to go to the land-office, it being the opinion of them both, that without some written authority the officer would not deliver the patent to any other person than him who entered the land: that shortly after this he became offended with his son, ordered him from the land, letting him know at the same time he would not convey it to him, and demanded the certificate; that his son demanded a deed,

which he refused to give him. His son then left the land, and did not return to it for some time: his son afterwards offered to purchase the land; the respondent refused to sell: that his son never pretended to claim the land under and by virtue of the assignment of the certificate, until a short time since; that his son has acknowledged that he had no claim to the land.

Hart denies that he purchased with notice of the complainant's claim; that he never heard that the complainant claimed the land before he purchased, and at that time he had no notice of the complainant's right, and maintains that he is an innocent purchaser for a valuable consideration, without notice of any conflicting claims.

Parks does not deny but that he purchased with notice of the claim of the complainant. It was proved, on the hearing, that the defendant, Joseph Halsa, acknowledged to one witness that he had assigned the certificate to his son. By another, it was proved that he had said he had given to his son the land in dispute, and other property, in consideration of his son removing from Livingston and settling in his neighborhood. Another witness testified, that the defendant, Joseph Halsa, told him that he had given, or would give, the land to his son, and for that reason refused to sell it to the witness; that the complainant went upon the land in the year 1835, and improved it by building a cabin and clearing from six to ten acres, which before was wild and without improvement, and during that year raised a crop of tobacco, and built a tobacco barn partly on the land. The complainant raised another crop of tobacco, and the year afterwards removed his cabin from the land, and put it on an adjoining tract. In 1837 complainant hired himself out to labor, and did not cultivate the land, which was done by some of the children of the defendant, Joseph Halsa. In the Fall of 1837 the complainant went to Florida, and returned in the winter, and went on the land, where he has since resided. Witness also testified, that both the defendants, Hart and Parks, lived in the neighborhood of the complainant, Hart within one mile, since the Spring of 1840.

On the hearing, the court dismissed the bill, from which the complainant has appealed to this Court.

Two questions arise on the record. The first is, whether the complainant has any interest in the land in controversy?—the second, whether, if he had, is the defendant, Parks, in such a condition, or has he shown that he is a purchaser of such a character, that a court of equity will not lend its assistance against him?

We cannot see on what ground it can be urged that the assignment of the certificate did not, so far as Halsa, the father, was concerned, pass an equity to the complainant. It was a sufficient note or memorandum to take the transaction out of the operation of the statute of frauds. This point has been long since settled by this Court, in the case of Bean and Others *vs.* Vallé and Others. (2 Miss. Rep., 126.) There it was held, that the word, "transferred," endorsed on the certificate, and signed by the holder thereof, passed an equity to the assignees. There is nothing that supports the pretence of the father, that the assignment was made to enable the son to obtain the patent from the office, that he might bring it home to him. It is strange; if the son was only to bring him

home his patent, that the assignment should be written in such language as would authorize the issuance of a patent in the name of the son. If, as he says, he believed that a written order was necessary to empower the son to receive it from the officer, it is not pretended that he thought the order should have been so written as to require the government to issue the patent in the name of the son. Another circumstance is conclusive on this head, independent of the direct evidence of the witnesses. The certificate was delivered to the son, and he continued in the uninterrupted possession of it for a considerable time, and a demand for it was never made, nor did a thought of returning it ever occur, until the difficulty between Joseph Halsa, the defendant, and his son, or, as he expresses it, until he became offended with him. Such pretences, put forth in a defence, so far from aiding the cause of the respondent, serve only to detract from the weight the law allows an answer.

Was the assignment supported by a valuable consideration? It does seem it is only necessary to state the proposition in order to answer it. On what ground can it be maintained, that the removal of a young man a considerable distance, who is married and house-keeping, is not a sufficient consideration to support a conveyance for eighty acres of unimproved land? Those who have experience in such matters know that the trouble, inconvenience, and expense of breaking up and removing are not inconsiderable; indeed, it has become a proverb among us, that two removes are as bad as one fire. It may be said, the removal of the son was no benefit to the father, aside from the pleasure and gratification that would arise to a parent from the society of his children. It would not, perhaps, be a benefit to the father greater than as stated; but a benefit or advantage to the grantor is not the test of the value of a consideration. Inconvenience, trouble, or expense borne by the grantee will make the consideration as valuable in law as benefits conferred on the grantor.—Allison *vs*. Singleton, Littell's Select Cases, 30.

If the consideration was valuable, it may be objected, it was necessary to express it in the assignment of the certificate, and not being so expressed, the agreement was not binding under the statute of frauds. This was the law, as declared in England in the case of Wain *vs*. Walters; (5 East;) but in the case before referred to, of Bean et al. *vs*. Vallé at al., this question underwent an elaborate argument, and this Court came to the conclusion, that a correct construction of the statute of frauds did not require that the consideration should be expressed in the note, memorandum, or agreement, concerning a sale or transfer of lands, or an interest in them.

If, then, the complainant was a purchaser for a valuable consideration, of an equity in the land in controversy, is the defendant, Parks, in such a situation with regard to the title to this land, that a court of equity will not lend its assistance against him? We will here premise that neither the defendant, Parks, nor Hart, claims in his answer any protection, or any advantage under the statute concerning the recording of conveyances; indeed, so far from seeking any assistance from that statute, it does not appear that either of their deeds have been recorded. This being the fact, this cause will be determined as though that statute was not in existence. It is one wholly without its provisions. The.

controversy will turn on the question, whether Hart is a *bona fide* purchaser for a valuable consideration, without notice of the equity of the complainant? There is no doubt of the correctness of the proposition, that a purchaser without notice from one who has fraudulently purchased is not affected by the fraud; and a purchaser with notice to himself from one who purchased without notice, may protect himself under the first purchaser. (Bumper *vs.* Platner, 1 Johns. Chan. Rep., 213.) Parks claims as a vendee under a purchaser without notice. The transaction amongst all the defendants is very suspicious, and it has much the appearance of a conspiracy to defraud the complainant. It was known that Parks could be affected with notice of the complainant's equity. It appears he was anxious to purchase the land, but he was not so bold as to have a conveyance made directly to himself; he looks around for one who, he supposes, had no notice of the right of the complainant, and that individual, he imagines, he found in the defendant, Hart. Halsa, the father, then sells to Hart, on the 18th of January, for three hundred dollars, and only four days thereafter, on the 22d of the same month, Hart conveys to Parks for three hundred dollars. So, if the consideration of the two deeds is truly stated, Hart did not make as much by his speculation as paid the fee for an acknowledgement of his deed, and the rent of the land four days in the month of January was not, we may well presume, worth a great deal. Why did Hart have anything to do with this transaction? No sufficient motive for his conduct appears from the proceedings in this cause, but a desire to assist Halsa and Parks to defraud the complainant. Parks does not deny but that he had notice of the right of the complainant, or if he did deny it, the evidence in this cause contains an ample refutation of his denial. But he claims under Hart, who had no such notice, and who is represented as a *bona fide* purchaser, for a valuable consideration, without notice. Let it be borne in mind that Hart, in his answer, only asserts that he is an innocent purchaser, without notice of any conflicting claims. He does not pretend that the purchase money was paid, nor does he deny any facts and circumstances from which notice may be inferred. He does not deign to tell us why he purchased on the 18th, and afterwards, on the 22d of the same month, sold for the price which he paid for the land. He cannot pretend dissatisfaction with his purchase, for he must have known the land, having lived within a very inconsiderable distance of it for some time. He does not, nor, it is presumed, he cannot, deny notice of the possession of the complainant. See Bartlett *vs.* Glasscock, (4 Mo. Rep., 67.) He does not explain how it was that he told a witness Halsa, the father, was about to get five or six acres of the land for him to cultivate. All these matters are unexplained, and there is a general assertion in his answer, that he is an innocent purchaser without notice. It is imagined that a party who relies on the defence of a *bona fide* purchaser without notice, must show something more than these defendants have done. In the case of Frost *vs.* Beckman, (1 Johns. C. Rep., 288,) it was held, that a party claiming relief in equity as a *bona fide* purchaser, must deny notice, although it is not charged. In Geraud *vs.* Sanders, (2 Ves., jun., 454,) the defendant pleaded a purchase for a valuable consideration without notice, and it was held that he was bound to deny fully, and in the most precise terms, every circumstance from

whence notice could be inferred. So, in the case of Denning *vs.* Smith, (3 Johns. C. Rep., 345,) Chancellor Kent says, if a purchaser wishes to rest his claim on the fact of being an innocent *bona fide* purchaser, he must deny notice, even though it be not charged; he must deny it positively, not evasively; he must deny fully, and in the most precise terms, every circumstance from which notice could be inferred.

In the case of Jewett *vs.* Palmer, (7 Johns. C. Rep., 65,) it was held, that to support the plea of a *bona fide* purchase without notice, the party must not only aver and prove that he had no notice of the rights of the other party, but that he actually paid the purchase money before any such notice. It is not sufficient that he has merely secured the purchase money. The Supreme Court of the United States, in the case of Wormly *vs.* Wormly, (8 Wheat., 421,) says, it is a settled rule in equity, that a purchaser without notice, to be entitled to protection, must not only be so at the time of the contract or conveyance, but at the time of the payment of the purchase money. In another work of great authority it is said, a plea of a purchase for a valuable consideration, without notice, must be with the money actually paid, or else, according to Lord Hardwick, you are not hurt. The averment must not only be that the purchaser had no notice at or before the execution of the deeds, but that the consideration was actually paid before notice. Even if the purchase money be secured to be paid, yet, if it be not in fact paid, the plea of a purchase for a valuable consideration will be overruled.—Fonb. Equity, 444.

It appears, from these principles so well established in courts of chancery, that the defence of the defendants has no existence in equity; they have failed entirely to sustain themselves on the grounds on which they have rested. The decree of the court below is therefore reversed; and this Court, proceeding to enter such decree as should have been entered by the court below, doth order, adjudge, and decree, that all the right, title, claim, and interest of Peterson Parks, aforesaid, in and to the west half of the south-west quarter of section twenty-two, in township fifty-three, and range eighteen, containing eighty acres of land, do rest in Amos Halsa, aforesaid, and his heirs forever; and that the defendants pay all costs of this suit, as well in this Court, as in the court below.