GEORGE W. FULLER, Appellant, v. TOOTLE-CAMPBELL DRY GOODS COMPANY, Respondent.

### Kansas City Court of Appeals, May 24, 1915.

1. **CORPORATIONS: Capital Stock: Authority to Bind Corporations.** Plaintiff brought suit to recover the purchase price of certain shares of the capital stock of a mercantile corporation, which he claims were bought by defendant under a written contract. The name of the defendant, a corporation, was signed to the contract by its secretary. Payment was resisted upon the grounds that the secretary, who was also credit man, did not have authority (implied from a course of business sanctioned and pursued by defendant), to sign such contract without consulting his superior officers, and that the obligation imposed by the contract was not supported by a consideration. It was *held* that the evidence was sufficient to take the question of consideration to the jury and to show that a credit man of a business, such as was conducted by plaintiff, as a rule has no authority to bind his principal to an obligation for the payment of money; and it was *further held* that the secretary of a trading corporation has no power, as such, to sign the name of the corporation to obligations for the payment of money.

Appeal from Buchanan Circuit Court.—*Hon. Wm. D Rusk*, Judge.

REVERSED AND REMANDED.

*John E. Dolman, Robert B. Fizzell* and *Bowersock, Hall & Hook* for appellant.

*Robert A. Brown* for respondent.

JOHNSON, J.—This is an action to recover the purchase price of certain shares of the capital stock of a mercantile corporation which plaintiff alleges defendant bought at their par value of $7000, under the terms of a written contract dated December 27, 1910. De-

fendant is a corporation engaged in the wholesale dry
goods business at St. Joseph and its name was signed
to the contract by C. R. Bernard as secretary. The
answer denies that defendant "or anyone authorized
to act for it ever executed or delivered to plaintiff the
alleged contract . . . avers that said contract was
wholly without consideration to this defendant . . .
and that plaintiff knew, or had reason to know, that
the alleged contracts referred to in the petition were
not executed by the defendant or anyone authorized to
execute the same in its behalf."

The petition alleges that the contract was an inte-
gral part of a single transaction whereby in considera-
tion of defendant's agreement to purchase the stock
certain benefits (the nature of which we shall disclose)
were secured to defendant under the terms of a sepa-
rate written contract dated December 12, 1910, to which
plaintiff and defendant were parties. A trial of the
issues raised by the pleadings resulted in a verdict and
judgment for defendant and plaintiff appealed.

Defendant was incorporated and embarked in the
wholesale dry goods business at St. Joseph in 1909. Its
principal officers were Milton Tootle, Jr., president, T.
B. Campbell, vice-president, and C. R. Bernard, secre-
tary and credit man. Tootle and Campbell organized
the company and were its principal shareholders. Too-
tle had other important business interests and did not
participate in the active management of the business
until after the death of Campbell which occurred in
September, 1911. The latter was the active manager
until the malady (Bright's disease) which ended his
life impaired his activity and caused him to rely more
and more upon Bernard, the secretary, who, the evi-
dence of plaintiff tends to show, performed duties and
assumed authority on behalf of the corporation, during
the lingering illness of Campbell, that are not usually
exercised by such officer.

Bernard had been secretary and credit man of the John S. Brittain Dry Goods Company, another wholesale merchant of St. Joseph, had extended credit on behalf of that company to W. H. Fuller, a retail dry goods dealer at McAlester, Oklahoma, and when defendant began business, induced Fuller to transfer his trade from the Brittain Company to defendant on the understanding that the latter would fill his orders and wait for payment until after he had paid off his indebtedness to the Brittain Company which exceeded $11,000.

It appears from the evidence of plaintiff that defendant, having abundant capital, was willing to extend credit to desirable customers beyond that usually granted by wholesale dry gods merchants and that this arrangement for securing the business of Fuller was disclosed by Bernard to Campbell and was approved by him. At different times Fuller had been required to make financial statements to the Brittain Company and on, and after, transferring his trade made such statements to defendant. In none of them was the fact disclosed that he owed his father (the plaintiff) $28,500, and his wife, $22,500, for borrowed money. It is clear that Bernard knew of these debts. It is not certain that he told Campbell about them, and it is certain that Tootle knew nothing about the arrangement with Fuller since, at the time the account was opened, he was not participating in the active management of the business and was not consulted about such matters. Fuller bought heavily of defendant—the orders being supervised and approved by Bernard—and paid but little on the account thus made and in the autumn of 1910 it had grown to about $30,000, and had been closed, with the exception of a comparatively small amount, into unsecured promissory notes which he executed and delivered to defendant.

At this time Bernard began to exhibit concern over the situation and endeavored to have Fuller put the demand in better shape. He visited Kansas City where

plaintiff, who is a man of large means, resides, and had an interview with plaintiff and his son in which he vainly tried to induce plaintiff to guarantee the payment of his son's debt to defendant. Bernard then invoked the assistance of John C. Landis, Jr., an attorney at St. Joseph whom he had employed to represent defendant in legal matters pertaining to the credit department, and gave him plenary authority to make the best settlement he could with Fuller. At that time Fuller's indebtedness amounted in all to about $100,-000, consisting of $28,500 to his father, $22,500 to his wife, $30,000 to defendant, $7,000 to the Fidelity Trust Company of Kansas City, and about $12,000 to various mercantile creditors. His assets consisted of a stock of merchandise at McAlester of the estimated value of $25,000 to $30,000, accounts and bills receivable appraised at $10,000, the good will of the business which was thought to be of material value and, in addition, the expectations he had as an heir of his father. In any view of his financial affairs he was insolvent and the only hope Landis and Bernard had for escaping heavy loss on the demand was to induce, or coerce, plaintiff into securing its payment. They threatened bankruptcy proceedings and intimated pointedly that Fuller had incurred a criminal liability on account of not mentioning his debts to his father and wife in his financial statements to defendant which would prevent him from obtaining his discharge as a bankrupt. Plaintiff was not moved by these considerations but declared the purpose of himself and his son's wife to prove up their demands against the estate of his son should he be adjudged a bankrupt and further convinced Landis that as his heir, his son had no expectations, having already received advancements in excess of what he would be entitled to receive from plaintiff's *post mortem* estate. Moreover plaintiff, who was vice-president of the Fidelity Trust Company, was liable to that company as an indorser upon his son's note

of $7,000 and would agree to no settlement of his son's affairs which did not provide for the payment in full of that debt.

There is evidence to the effect that W. H. Fuller had assured Bernard that his father and wife were willing to subordinate their demands to the claims of his mercantile creditors and, therefore, that as to such creditors they might be treated as non-existent and that Bernard, accepting this assurance, had consented to receive the financial statements made to the Brittain Company and afterward to defendant which, as stated, omitted reference to those debts, and there is some evidence tending to show that Bernard had not been thus innocently actuated, but with knowledge of these family debts and without any representation that they would be subordinated to claims of mercantile creditors, had allowed Fuller to omit them from his statements. There is no evidence that Bernard had any assurance from plaintiff or the wife of Fuller that they were willing to postpone the payment of their claims, or forego any of their rights as creditors.

Landis, who proceeded alone in the final negotiations with the Fullers, found himself confronted with a most difficult situation. His argument addressed to plaintiff as the father of an unfortunate, if not erring son, was coldly rejected and he had no ground upon which he might hope to force a preference of his client's demand over those of plaintiff and the wife of Fuller. With the latter demands allowed against the estate bankruptcy proceedings would not realize a dividend of more than ten per cent to creditors. Landis attempted (we think honestly, though there is some evidence to the contrary) to achieve a better result than this for his client. After an investigation into the tangled facts of the case and rather prolonged negotiations with plaintiff, W. H. Fuller and another mercantile creditor, conducted chiefly with the plaintiff at Kansas City, it was finally agreed to incorporate the

business in Oklahoma under the name of the W. H. Fuller Dry Goods Company, with a capital stock of $40,000, fully paid up by the transfer to the corporation of all the assets of W. H. Fuller, including the good will of the business. To this end a written contract was entered into under date of December 12, 1910, by defendant whose name was signed thereto by Landis as attorney, by Bradley-Metcalf Company, the mercantile creditor we have mentioned, whose name was also signed by Landis as attorney, and by plaintiff, and W. H. Fuller and his wife who respectively signed their own names.

This contract provided that plaintiff and Mrs. Fuller would release their claims of $28,500 and $22,500 respectively, so far as the property turned over to the corporation was concerned, and would not demand payment from W. H. Fuller or his estate until after all other demands against him had been satisfied; that defendant would accept $28,000 par value of the capital stock of the new corporation "in full settlement of an equal amount of their said indebtedness against W. H. Fuller;" that Bradley-Metcalf Company would accept $2,500 of the capital stock in full release and payment of an equal amount of indebtedness against W. H. Fuller; that plaintiff would accept $7000 of the stock in full settlement of the note of that amount to the Fidelity Trust Company and would pay that note, and that the new corporation would pay the remaining debts of W. H. Fuller. Defendant and Bradley-Metcalf Company further agreed to transfer their stock to W. H. Fuller upon payment of "the amount of the now existing indebtedness had by them against said W. H. Fuller with interest," etc. Provision was made for conducting the business of the corporation with W. H. Fuller as president at a salary of $1800 per annum and it was stipulated "that if, after a fair trial, the business has not shown a profit, that then the

stockholders of said W. H. Fuller Dry Goods Company shall have the right to dissolve the corporation in any manner which may seem proper to them, paying first the debts of said corporation and distributing the balance to the shareholders of said corporation in proportion to their respective shares.''

According to the evidence of plaintiff this contract was not signed by plaintiff and delivered until after the execution by Bernard as the secretary of defendant of the contract in suit which was as follows: ''In consideration of the agreement of George W. Fuller and Mrs. S. S. Fuller releasing any lien or claims which they may have against any of the assets now owned by W. H. Fuller, amounting to approximately $28,500 and $22,500 respectively, and of their agreement not to demand payment of said claims from said W. H. Fuller or his estate until after all other existing creditors of said W. H. Fuller have been paid in full we agree to purchase between now and January 1, 1913, the capital stock of the W. H. Fuller Dry Goods Company of McAlester, amounting to seven thousand dollars, ($7000) which has been accepted by you in settlement of a note of like amount now owing by W. H. Fuller to the Fidelity Trust Company and endorsed by you, and will pay you for said stock at your request on January 1, 1913, the sum of seven thousand dollars ($7000.) plus six per cent interest from January 1, 1911, less any amounts that may have been paid you as dividends on said stock.

TOOTLE-CAMPBELL DRY GOODS COMPANY.
(Signed)     C. R. BERNARD, Secretary.''

On behalf of defendant we find there is some circumstantial evidence from which an inference might be drawn that the contract in suit was not executed and delivered to plaintiff until after the execution and delivery of the contract dated December 12th. The

contract in suit was signed by Bernard as secretary, pursuant to the demand of plaintiff who would not accept defendant's signature by Landis as attorney.

The corporation embarked in business under the management of an agent sent from St. Joseph by Bernard. Orders were sent to defendant and filled under the direction of Bernard. Some of the creditors of W. H. Fuller were paid in full and Landis succeeded in compromising the claims of others. The corporation's business career was marked by vicissitudes and ended in dismal failure. Eventually it was thrown into bankruptcy by defendant and other creditors but not until defendant's investment had been swelled from $30,000 to $40,000 and had become practically a total loss.

Following the signing and delivery of the contract, Bernard surrendered to W. H. Fuller notes of his held by defendant amounting to $28,000, but made no entry of this fact on the books which showed that defendant was holding the stock of the new corporation as collateral security for those notes. Matters came to a crisis after the death of Campbell when Tootle, taking an active interest in defendant's affairs, began to probe into the Fuller transaction which he repudiated for defendant as soon as he became acquainted with its important features. The testimony of Bernard tends to show that Campbell approved the transaction but he was ill at the time and the evidence, as a whole, abundantly supports the inference that Bernard, from the beginning to the end of the unfortunate settlement, acted on his own initiative and on the assumption that he possessed full authority to do what he did on behalf of defendant. He seemed to realize that the by-laws conferred no such powers upon him as secretary or credit man but he states, and there is evidence to support the statement, that in other large affairs arising in the credit department, he had been allowed by Campbell

to exercise powers fully as wide as those he assumed to possess in the present case. Plaintiff paid his son's note to the Fidelity Trust Company and, pursuant to the terms of the contract in suit, tendered the note and stock he held in the new corporation to defendant and demanded payment of $7000 therein specified. Defendant refused the tender and demand and this suit followed.

No issue of fraud was pleaded in the answer nor was such issue submitted in the instructions. The instructions given at the request of plaintiff were bottomed on the theory that Bernard had been given authority to incur obligations on behalf of defendant in the adjustment and settlement of bad or doubtful claims, by a course of business known to and approved by defendant's managing officers, and the jury were told that ''if you find from the evidence that for several years or in numerous business transactions, C. R. Bernard was permitted by the defendant, without objection and in his official capacity, to pursue a particular course of conduct, it may be presumed as between the defendant and those dealing with it, upon the basis of his authority to represent it, that he has acted in conformity with instructions from those who have the right to control its operations. And in determining whether or not C. R. Bernard had authority to sign on behalf of defendant, the instrument sued on, you should consider the evidance, if any, as to the course of business pursued by the defendant and said Bernard, while in its employ, the transactions actually conducted by him for the defendant and the authority actually exercised by him in dealing between the defendant and others. And you are further instructed that the plaintiff was not bound in his dealings with said defendant, by the terms of any by-law of said defendant, unless he had notice thereof, but he was entitled, in the absence of such notice to rely upon the apparent authority

vested in said Bernard by such course of business, if any, provided that apparent authority was exercised in a matter within the general scope of said Bernard's employment.''

At the instance of defendant the jury were instructed: (One.) ''The court instructs you that C. R. Bernard, the secretary of the defendant company, had no power or authority as such secretary to bind the defendant by the contract or agreement executed by him on the twenty-seventh day of December, 1910, and introduced in evidence as plaintiff's Exhibit One.''

(Two.) ''As adjuster or credit man for the defendant company the witness C. R. Bernard possessed such powers only as were specifically delegated to him by the defendant company by by-law or action of its board of directors or as are ordinarily exercised by persons holding a like or similar position, and if you believe from the evidence that it was not usual or customary for persons holding a like or similar position to that held by the said Bernard with the defendant company to execute on behalf of their corporation employers' contracts like or similar to the contract introduced in evidence as plaintiff's Exhibit One, or contracts obligating such corporation employers to pay money, under circumstances similar to those shown in this case, and that no special authority had been delegated to the said C. R. Bernard to execute such contracts and that he had not prior to that time executed on behalf of the defendant other like or similar contracts with its knowledge and approval, then your verdict will be for the defendant.''

(Three.) ''If you believe from the evidence that all matters relating to the settlement of the W. H. Fuller claims at issue between the parties who executed the agreement dated December 12, 1910 and introduced in evidence as plaintiff's Exhibit Four

were intended by said parties to be finally adjusted and settled thereby, then the agreement dated December 27, 1910 and introduced in evidence as plaintiff's Exhibit One was without consideration and is null and void and you will find your verdict for the defendant.''

Since no issue of fraud was raised by the pleadings and submitted to the jury, we might pass that subject without comment, but in justice to Landis and Bernard who are accused in the evidence and argument of defendant of bad faith in the performance of their fiduciary duties and in the exercise of powers not conferred upon them by defendant, their employer, we think our view of the evidence bearing on this accusation should be stated. The settlement negotiated by Landis with the Fullers, to which effect was attempted to be given in the two contracts in evidence, is subject to the criticism of being unwise and prejudicial to defendant's interests, even in view of the difficulties of the situation which confronted him. Grant that he was justified in assuming that Fuller's expectations as his father's heir had been wiped out by advancements, or, at any rate, would not be available to his creditors and, therefore, that the only assets creditors could reach were the stock of merchandise, bills and accounts receivable and good will of the business at McAlester which, at the estimated face value, amounted to only two-fifths of Fuller's total indebtedness, the settlement still was unsound since it released valuable prospective rights of defendant and created a risk of an additional heavy loss, without giving defendant a fair chance to achieve a substantial reciprocal benefit. Against the elimination of the claims of plaintiff and of Fuller's wife as demands against the tangible, existing assets, defendant was required, in effect, to subordinate its claims to the claims of all other creditors, to assume the payment of the demand of $7000 for which

plaintiff was liable as an indorser, to keep the stock at McAlester replenished with new goods, to assume the burden and annoyance of the management of the business and to allow Fuller to receive from its proceeds a salary of $1800, per annum. For this burden, risk or further loss and dismissal of Fuller from personal liability, defendant would receive seven-tenths of the net proceeds of the assets remaining after the payment of all other creditors, and out of this share must needs pay the purchase price of the worthless stock issued to plaintiff. After making due allowances for shrinkage and depreciation of the property defendant could not hope under the most favorable circumstances to realize more than twenty per cent of its original demand or ten per cent more than the dividend it would receive if the business were administered in the bankruptcy court. The risk was out of all fair proportion to the meager chance of gain which was not even a substantial equivalent for the release of the debtor from personal liability. That liability itself was an asset of value, despite the peremptory assertion of plaintiff that his son had reached the limit of paternal favor. The bankrupt of today often becomes the rich man of tomorrow and the son of a rich, indulgent father may always be regarded as within the pale of his father's bounty.

But the display of unsound business judgment is one thing and bad faith is another and entirely different thing. There is nothing in the evidence to suggest that this elaborate scheme was anything but the fruit of an over-zealous optimism shared by Bernard who, with full knowledge, approved it and instructed Landis to carry it out. Landis was employed by Bernard, was required to and did report to him and followed his instructions without knowledge of any lack of authority in him to bind defendant to all the terms of the proposed settlement. Indeed, the course of business which had been followed in defendant's

credit department with which Landis had been made familiar was such as to induce the belief that defendant had conferred full managerial powers and duties upon Bernard in that department. Bernard had only two superior officers viz., Tootle, the president, and Campbell, the vice-president. One gave the business no attention, the other, who was the active manager, was too ill to give it proper attention. The business was allowed to run itself and Bernard as the head of the credit department was given as free a hand in the management of that department as he would have had if he had been the supreme officer of the company. He appears to have been unequal to a task of such magnitude, unaided and uncontrolled. He erred in accepting at par the assurance of Fuller that his debts to his father and wife were subordinated to the claims of his commercial creditors; in allowing the account to grow to such huge proportions and in approving the settlement negotiated by Landis, but these were palpable mistakes of judgment and were not born of any fraudulent or unfaithful purpose or motive. His failure to enter on the books the fact of the surrender of Fuller's notes was the only culpable act disclosed in the evidence and this may as well be attributed to weakness as to any guilty motive. The severe judgment of the conduct of Landis and Bernard pronounced by defendant seems unjust. The extent of their offending lies in the making, in good faith, of an unwise settlement, and full responsibility for the loss should not be laid at their door, but should be shared by defendant's president and board of directors who, with full knowledge of the partial and growing incapacity of the vice-president and manager from a malignant disease, neligently allowed the business to run without proper management and thereby thrust duties and responsibilities upon Bernard beyond his capacity. So much for the accusation of bad faith.

The issues contested at the trial and submitted in the instructions may be reduced to two principal propositions, viz.:   First.    Did Bernard, in his capacity of secretary and credit man, have authority, implied from a course of business sanctioned and pursued by defendant, to enter into the contract in suit on behalf of defendant without consulting his superior officers?   Second.   Was the obligation imposed on defendant by the contract supported by a consideration?   The answer raised the additional issue that the contract was *ultra vires,* but this issue was properly dropped before the submission of the case to the jury.  There can be no question of the power of a trading corporation, such as defendant, to incur an obligation for the payment of money in aid of the adjustment and settlement of a demand against its debtor which is of doubtful and uncertain value.

It is argued by plaintiff that the defense of no consideration is not in the case and should not have been submitted, as it was, in defendant's third instruction for the reasons, first, that it was not properly pleaded in the answer and, second, was entirely unsupported by evidence.   The answer alleged that "said contract was wholly without consideration to this defendant."   Counsel for plaintiff argue that the term "consideration" was not intended by the pleader to be understood in its full legal sense but as meaning a benefit to defendant and the rule is invoked that a benefit to the promisor is not necessary to supply a consideration for the promise since a detriment to the promisee is equally as efficacious. [Halsa v. Halsa, 8 Mo. 303; Williams v. Jensen, 75 Mo. 681; German v. Gilbert, 83 Mo. App. 411.]

The language employed suggests no such restricted meaning; the case was tried by the court and parties on the theory that the issue of no consideration was fully tendered in the answer and the argument smacks too strongly of mere academic refine-

ment to merit serious consideration. The same may be said of the interpretation by plaintiff of the words "to this defendant." It is true that a benefit to a third person secured by a contractual promise is a sufficient consideration therefor (Green v. Higham, 161 Mo. 333; Strode v. Transit Co., 197 Mo. 616) and it may be added, in law, is as much a consideration to the promisor, as a direct benefit to him. The answer properly raised the defense and there was evidence to go to the jury in support of the issue of fact submitted in defendant's third instruction. If we were sitting as triers of fact we would find that the contract in suit was signed by Bernard and delivered to plaintiff before the execution and delivery of the contract dated December 12th, and that the two were mutually intended to cover a single transaction, but there is substantial evidence to support the inference drawn by the jury that the contract of December 12th was executed before the other and before any agreement was made by Bernard to purchase plaintiff's stock in the new corporation.

The suggestion that on the hypothesis of the two contracts evidencing independent agreements, the promise of defendant to purchase the stock had the consideration of plaintiff's reciprocal promise to deliver, is met with the answer that though in form the contract was one of sale and purchase, in substance it was nothing less than an undertaking of defendant to pay the debt of Fuller to the Trust Company and was wholly without consideration, if divorced from the agreements evidenced and given contractual stability by the prior contract.

Passing to the issue of Bernard's authority to execute the contract on behalf of defendant, we have shown in the statement of facts that the evidence on the issue of whether or not he had been allowed to exercise unusual powers by a course of business approved by defendant, is conflicting, though as we

have indicated in our discussion of the accusation of fraud, we think the true fact is that defendant, in such manner had given him plenary authority to bind and loose in matters arising in his department. But there is substantial evidence to the contrary and defendant was entitled to have the issue submitted to the jury and if it was properly defined in the instructions, the verdict must be accepted as the final solution of that controversy. The evidence shows that a credit man of a business house, as a rule, has no authority to bind his principal to an obligation for the payment of money and it is well-settled law that the secretary of a trading corporation has no power, as such, to sign the name of the corporation to obligations for the payment of money. [Bank v. Hogan, 47 Mo. 472; Sanders v. Chartrand, 158 Mo. 352.] Defendant's first instruction stated a correct rule of law but plaintiff contends that it should not have been given without qualification to adapt it to the issue of Bernard's implied authority derived from a sanctioned course of business. Standing alone the instruction would amount to a peremptory direction to return a verdict for defendant, since it is conceded that Bernard did sign the contract as secretary; but instructions must be read together as a single charge and thus reading defendant's first and second instructions, we think the issue of implied authority was correctly defined in language the jury could not well misunderstand.

The dual nature of Bernard's employment, i. e., secretary and credit man, is assumed, and while the jury are told that as secretary he had no power to sign the contract and that as credit man he had no such power, if it were not ordinarily exercised by persons holding a like or similar position, they were further told, in substance, that if Bernard had "prior to that time executed on behalf of the defendant other

like or similar contracts with its knowledge and approval" they should find he had authority to execute the contract in suit. This was in exact accord with the rule defined in plaintiff's second instruction, from which we have quoted, and the jury must have understood that they were not peremptorily directed to find for defendant on the ground that a secretary of a corporation, as such, had no authority to bind the corporation but that the question for their solution was whether or not Bernard, either as secretary or credit man, had been suffered by defendant, with knowledge of the facts, to incur money obligations on behalf of defendant in his management of the credit department. There was no prejudicial error in the instructions.

Complaint is made of rulings on evidence. The first relates to questions asked Bernard on cross-examination, but that objection will be dismissed with the observation that the subject of inquiry was within the legitimate scope of cross-examination. A more serious question is presented by the ruling of the court in allowing defendant's witness Tootle, over the objection of plaintiff, to repeat the following conversation he states he had with W. H. Fuller, after the repudiation of the settlement by defendant, and not in the presence of plaintiff: "I asked him why the indebtedness of his father and his wife had not been included in the statements. He said, 'Well, it is true that he had never put it in any written statement that he had given, but he had told Mr. C. R. Bernard of this indebtedness and that he had an arrangement whereby his wife and his father would not present their indebtedness against any other creditor that Fuller had in his business, and that he had told Mr. Bernard this, and Mr. Bernard had said, 'well, strictly speaking it is not necessary to go into the statements because it is not a matter of any interest to your creditors whatever.' In this conversation

with Mr. Fuller regarding this statement, he volunteered the information that Mr. Bernard had requested him not to put in his written statement to our company, the debt of seven thousand dollars that he owed the Fidelity Trust Company, for the reason that his father was an endorser on the note and would take care of it, and that he would not like to have that indebtedness shown in his financial statements; that he did not want the officers of the Tootle-Campbell Company, to know of the fact that he owed this money to the Fidelity Trust Company. Mr. Fuller then told me that he answered Mr. Bernard in this way—that he would not care to make any financial statements to anyone that did not show all of his liabilities.''

Counsel for defendant attempt to answer the contention of their opponents that the testimony was pure hearsay by saying it was germane to the issue of a conspiracy between plaintiff, his son, Bernard and Landis to defraud defendant and by pointing to the rule that admissions of a party to such conspiracy made before its consummation may be received in evidence against his co-conspirators.

But this argument must be rejected for the reason, if for no other, that fraud was not pleaded in the answer and, therefore, was not an issue in the case. As has been stated, the only issues raised by the pleadings and submitted to the jury were those relating to the alleged lack of authority in Bernard to make the settlement and to sign defendant's name to the contract in suit, and the defense of no consideration. Such being the full scope of the defense the testimony in question cannot be regarded otherwise than as hearsay and the court erred in admitting it. But as with other errors occurring at the trial of a case, error in admitting hearsay evidence to constitute good ground for disturbing the judgment must appear to have been prejudicial—of such character that it must be presumed to have influenced the

minds of the jury to the detriment of the party against whom it was received.

If the statement the witness testified Fuller made to him had not proceeded beyond the part relating to the omission of the debts of plaintiff and Fuller's wife from the financial statements made to defendant, we would hold the error harmless, since that part of the statement corroborated in every essential particular the testimony of plaintiff's witnesses on the same subject, was merely cumulative and could not have been prejudicial. But the hearsay testimony did not stop at the cumulative limit of the alleged admission. Bernard had denied on cross-examination that he advised Fuller to omit from his financial statements mention of his debt to the Fidelity Trust Company. Fuller, the son, introduced as a witness by defendant, denied having received such advice or suggestion, or of having stated to Tootle that he had been thus advised.

The admission of Fuller, as related by Tootle, contradicted his testimony on that subject as well as the testimony of Bernard, and injected into the case an evidentiary accusation against Bernard which, if believed by the jury, struck a vital blow at his credibility as a witness and thereby tore from plaintiff's evidentiary edifice its main supporting pillar. Plaintiff was compelled to depend on the testimony of Bernard for proof of the course of business of defendant from which he implied authority in Bernard to bind defendant to the contract in suit. If this proof were removed the collapse of his case would be inevitable. This hearsay admission contained the only concrete evidentiary charge against Bernard of infidelity to his employer. He knew that W. H. Fuller primarily was liable for the payment of the note to the Trust Company, and to advise him to omit that debt from his statements because "he did not want the officers of the Tootle-Campbell Company to know

of the fact that he owed this money to the Fidelity Trust Company,'' was not only the grossest sort of a breach of trust, indicative of a fraudulent motive, but amounted to a declaration that his authority as secretary and credit man was restricted to a much narrower scope than that which he assumed, both in the granting of credit to Fuller and in entering into the settlement in controversy. Consequently the hearsay admission had a direct bearing upon the question of the scope of Bernard's authority, as well as an indirect bearing, through the assault upon his credibility as a witness.

The error was highly prejudicial. The judgment is reversed and the cause remanded.

All concur.