FIDELITY NATIONAL BANK AND· TRUST COM-
PANY, Executor of Estate of GEORGE W. FUL-
LER v. TOOTLE-CAMPBELL DRY GOODS COM-
PANY, Appellant.

### Division Two, March 18, 1922.

1. **PRINCIPAL AND AGENT: Contract by Agent: Authority: Burden of Proof.** One who sues another as principal upon a written contract purporting to be made by an agent for such principal, where the authority of the agent to make the contract is put in issue by verified answer, has the burden of proving the agent's authority.

2. ———: ———: ———: **Holding Out: Single Transaction.** Where there is no evidence that an agent ever ·did another act involving his principal such as the one in suit, which latter was beyond the apparent scope of his duties as such agent, there is no basis for holding the principal liable on the ground of having held out the agent by a course of dealing as having authority to do the act in question.

3. ———: ———: ———: **Corporation Secretary and Credit Man.** A corporation is not liable upon a contract signed in its name by its secretary, who was also its credit man, purporting to bind it in effect to pay the debt of a third party, where such contract was signed without the knowledge or consent of any other officers of the corporation and had been concealed from them and was repudiated by the corporation's president as soon as he had knowledge of it, and where the evidence showed that the secretary had never made a similar contract on behalf of the corporation, and the by-laws prohibited the signing of such an obligation without the concurrence of some other officer of the corporation.

4. ———: ———: ———: **Inquiry.** One who deals with another acting as the secretary and credit man of a corporation and making a contract whereby, in effect, he undertakes to bind the corporation to pay the debt of a third person. and who has had no prior dealings with such person or corporation and has no knowledge of any former similar transactions by him, is put upon inquiry as to his authority to bind the corporation.

Appeal from Platte Circuit Court.—*Hon. Alonzo D. Burns*, Judge.

REVERSED AND REMANDED.

  *Robert A. Brown, Richard L. Douglas* and *James H. Hull* for appellant.

  (1)  The court below erred in giving plaintiff's Instruction 3.  (a) The instrument sued on was signed by C. R. Bernard as secretary for the defendant.  In that capacity he had no authority to sign said instrument or any other instrument obligating the company to pay money, other than checks and drafts, as provided by defendant's by-laws.  Bank v. Hogan, 47 Mo. 472; Sanders v. Chartrand, 158 Mo. 352;  Fuller v. Tootle-Campbell D. G. Co., 189 Mo. App. 514.  (b) Since Bernard, as secretary, was without authority to bind the defendant by the instrument executed by him, it devolved upon plaintiff to prove by the preponderance of the evidence that in the general course of defendant's business it had permitted the said Bernard to sign papers of a like or similar character, obligating the defendant to pay money other than checks or drafts, or to show that by reason of the provisions of the by-laws of the defendant or some act of its controlling officers, the said Bernard had been authorized to sign papers of a similar character. Scotland County Bank v. Hohn, 146 Mo. App. 699; Johnson v. Harley, 115 Mo. App. 513;  Knoche v. Whitman, 86 Mo. App. 568.  (c)  The instruction did not limit the jury to any particular facts or to any facts in determining whether Bernard had authority to sign the paper, but it gave to the jury a roving commission to find without evidence or any particular character of evidence, that Bernard did have authority to sign the paper.  It is error for an instruction to broaden the issues and to give the jury a roving commission.  Lauff v. Carpet Co., 186 Mo. App. 186; Sparkman v. Railroad, 191 Mo. App. 463; Clark v. Motor Co., 177 Mo. App. 623.  (2)  The court below erred in giving plaintiff's Instruction 4.  Tyler Estate v. Hoffman, 146 Mo. App. 510;  McAlester v. Const. Co., 181 S. W. 60;  Hackett v. Van Frank, 105 Mo. App. 384;  Gregory v. Loose, 19 Wash. 599, 54 Pac.

33; 31 Cyc. p. 1218. (3) A party in order to avail himself of the apparent authority rule must show that he was aware of the course of conduct from which such apparent authority might be presumed. Paper Mfg. Co. v. Bank, 199 Ill. 151; Merchants Bank v. Nichols, 223 Ill. 45; Grant v. Humerick, 123 Iowa, 571; Hastings Bank v. Bank, 56 Neb. 149; Gibson v. Trow, 105 Wis. 288. (4) He must also show that he relied on such course of conduct. Advertising Co. v. Wanamaker, 115 Mo. App. 270; Hackett v. Van Frank, 105 Mo. App. 396; Fulton v. Medicine Co., 145 Ala. 331; Rogers v. Peckham, 120 Cal. 238; Jackson Paper Mfg. Co. v. Bank, 119 Ill. 151; Hastings Bank v. Bank, 56 Neb. 149; Fike v. Otto, 76 Neb. 439. (5) It was not pretended that plaintiff actually knew of the course of conduct pursued by Bernard, or that he relied upon any such course of conduct.

*Justin D. Bowersock* and *Robert B. Fizzell* for respondent.

(1) Plaintiff's Instruction 3 was properly given. (a) It was not based on Bernard's official authority as secretary, but on his general authority as agent. (b) It did not broaden the issues or give the jury a "roving commission" on the question of authority. What constitutes authority was fully defined in plaintiff's Instruction 4 and in defendant's Instructions 5 and 6. (c) The language "in pursuance of a fraudulent conspiracy" is properly explained in plaintiff's Instruction 5. (d) The words "that the plaintiff was a party to such combination" were proper. Belt Ry. Co. v. Ry. Co., 118 Mo. 625; Waers v. Wiesberg, 152 Mo. App. 276. (2) Plaintiff's Instruction 4 was properly given. (a) It properly limited the implied or apparent authority of an agent arising from a course of business. Martin v. Webb, 110 U. S. 7. (b) It properly stated that plaintiff was not bound by defendant's by-laws without notice thereof. Smoot v. Life Assn., 138 Mo. App. 465; Rosenbaum v.

Gilliam, 101 Mo. App. 135; State v. Overton, 24 N. J. L. 435; Hagerstown Brewing Co. v. Gates, 117 Md. 348; Am. Natl. Bk. v. Auto Co., 31 S. D. 524; 10 Cyc. 351. (c) Plaintiff was entitled to rely on authority vested in agent by the course of business. Rosenbaum v. Gilliam, 101 Mo. App. 126; Butler Co. v. Boatmen's Bk., 143 Mo. 13; Sparks v. Transfer Co., 104 Mo. 531. (d) The jury was properly limited to the general scope of the agent's authority. 3 Cook on Corporations, sec. 720, p. 2322. (3) The instructions should be considered as a whole. Minter v. Bradstreet Co., 174 Mo. 495; Norton v. Kramer, 180 Mo. 544. (4) Verdicts not set aside for defect in one instruction, if instructions as a whole correctly declare law. Chambers v. Chester, 172 Mo. 461.

HIGBEE, J.—This suit was instituted by George W. Fuller on the following contract addressed to him: "In consideration of the agreement of George W. Fuller and Mrs. S. S. Fuller releasing any lien or claim which they may have against any of the assets now owned by W. H. Fuller, amounting to approximately $28,500 and $22,500 respectively, and of their agreement not to demand payment of said claims from said W. H. Fuller or his estate until after all other existing creditors of said W. H. Fuller have been paid in full, we agree to purchase between now and January 1, 1913, the capital stock of the W. H. Fuller Dry Goods Company of McAlester, amounting to seven thousand dollars, which has been accepted by you in settlement of a note of like amount now owing by W. H. Fuller to the Fidelity Trust. Company and endorsed by you, and will pay you for said stock at your request on January 1, 1913, the sum of seven thousand dollars plus 6% interest from January 1, 1913, less any amounts that may have been paid you as dividends on said stock.

"Tootle-Campbell Dry Goods Company,

" C. R. Bernard, Secretary."

The plaintiff having died since the appeal was taken, the cause has been revived in the name of his executor.

For convenience we may speak of G. W. Fuller throughout this opinion as the plaintiff. The question is: Did Bernard have authority to execute this contract?

The petition was filed in the Circuit Court of Buchanan County on April 18, 1913. On the first trial, the verdict was for the defendant. This judgment was reversed on appeal for error in the admission of evidence. [Fuller v. Tootle-Campbell Dry Goods Co., 189 Mo. App. 514.] Thereafter, on the application of the plaintiff, a change of venue was awarded to Platte County, and on the second trial a verdict was rendered for the plaintiff for the sum of ·$9130. Plaintiff remitted $117.50, and judgment was entered for $9012.50. The Court of Appeals transferred the case to this court because the sum involved exceeded $7500. The petition avers, in substance, that the defendant is a corporation doing business in the city of St. Joseph, Missouri; that prior to December 27, 1910, W. H. Fuller was engaged in general merchandising at McAlester, Oklahoma, and was indebted to the plaintiff in the sum of $28,500, to his wife in the sum of $22,500, to the defendant in the sum of about $30,000, and to various other creditors in various amounts; that he was also indebted to the Fidelity Trust Company on a note for $7,000 indorsed by plaintiff; that said Fuller was insolvent, and defendant, acting through its attorney, negotiated with said Fuller for the settlement of his debts, and that, on December 12, 1910, a contract was entered into between said Fuller, the defendant herein, the Bradley-Metcalf Company, the plaintiff herein, and his wife, Mrs. S. S. Fuller, by the terms of which it was agreed that the plaintiff and Mrs. Fuller would postpone the payment of the debts due them until after all other creditors of said W. H. Fuller had been paid in full; that said W. H. Fuller should cause to be incorporated under the laws of Oklahoma, the W. H. Fuller Dry Goods Company, with a capital stock of $40,000, consisting of 400 shares of $100 each, of which stock $28,000 should be assigned to the defendant in settlement of an equal amount of its claim against said

Fuller, $2400 of said stock should be assigned to said Bradley-Metcalf Company in settlement of its demand, and $7,000 should be assigned to plaintiff in settlement of W. H. Fuller's note to the Fidelity Trust Company, which plaintiff agreed to have released; that the W. H. Fuller Dry Goods Company was accordingly incorporated, and the stock thereof was issued and assigned as above stipulated; that as a part of the transaction, the defendant executed the contract sued on and plaintiff paid the $7,000 note to the said Fidelity Trust Company; that plaintiff has kept and performed the terms of said contract of settlement, and prays judgment.

The second amended answer, which was verified, alleges that Bernard and the parties to the contracts mentioned in the petition, wrongfully conspired together to incorporate the business of W. H. Fuller and to relieve him from his personal obligations; that all said parties knew that, by their conspiracy, they had entailed a loss on defendant of more than $40,000; that the assets of the W. H. Fuller Dry Goods Company were worthless; that the contracts were signed by the parties thereto without the authority or consent of defendant, and that the contract sued on was conceived in fraud, without consideration and void.

At the time the Tootle-Campbell Dry Goods Company was organized in the year 1908, Bernard was employed as its secretary and credit man. He was instrumental in securing his friend Fuller, a merchant of McAlester, Oklahoma, as a customer of the defendant, with the understanding that he would sell Fuller goods on credit and allow him to pay his indebtedness of about $14,000 to the Brittain Dry Goods Company, with whom he had been dealing. On August 20, 1910, Fuller executed his notes to defendant for $28,429.38, to apply on his account. Fuller had made several financial statements to Bernard, omitting all reference to his indebtedness to his wife and father. When Bernard learned of this indebtedness, he became very much concerned about Fuller's account. He stopped selling him goods and sent

Landis, an attorney at St. Joseph, whom he had for some time employed to assist in making collections, to Mc-Alester to investigate matters. A meeting was arranged at Kansas City between Bernard, G. W. Fuller, W. H. Fuller and Landis. This was the first time Bernard or Landis had ever met G. W. Fuller, who was a banker and vice-president of the Fidelity Trust Company. Bernard and Landis endeavored in vain to get plaintiff, G. W. Fuller, to indorse his son's notes to defendant. Suggestions of proceedings in bankruptcy and of criminal prosecution for obtaining goods on false financial statements did not move plaintiff. Finally, after several meetings, the contract to incorporate the W. H. Fuller Dry Goods Company and the contract sued upon were simultaneously executed, although bearing different dates, the incorporation effected, and stock assigned as alleged in the petition. Landis signed the defendant's name to the contract of December 12. On January 24, 1911, Bernard, as secretary for the defendant, also executed a contract for the purchase of the $2400 stock assigned to the Bradley-Metcalf Company. All this was done without the knowledge or consent of any of the defendant's officers, and, as defendant claims, without any right or authority to do so. T. B. Campbell, who was vice-president and general manager of the defendant company, in active charge of defendant's business, was afflicted with Bright's disease and taken to a hospital in November, 1910, where he died in the spring of 1911.

The plaintiff, G. W. Fuller, testified: The meeting with Bernard was held in my office at Kansas City in September or October, 1910; it was the first time I ever met Bernard. He claimed to be the secretary and credit man of Tootle-Campbell Dry Goods Company of St. Joseph, Missouri. I told him I would not indorse my son's indebtedness to the Tootle-Campbell Dry Goods Company. Landis claimed to be their attorney. They talked about putting my son into bankruptcy. I told them, as I understood it, down there is thirty or thirty-five thousand dollars' worth of stock and eight or ten

thousand dollars of notes and accounts. If you will pay this $7,000 note to the Fidelity Trust Company, which I have endorsed, I will waive any claim I have against W. H. Fuller and I will endeavor to get his wife to waive any claim she has. Go down and investigate the stock. I don't know what there is. I heard nothing more for two or three weeks. One morning Mr. Landis came in and said he had been down in Oklahoma, and that if I would stand to my proposition they would incorporate that business down there and continue it. I told him I would want a contract from the Tootle-Campbell Dry Goods Company to buy this stock from me in two years, signed by a proper officer of the company.

Witness then told about the signing of the contracts mentioned in the petition, and identified them; that he did not see Bernard or Landis after that; that he called on Tootle in St. Joseph and showed Tootle the contract sued on. Tootle said he would like to have a copy of it; don't know that he knew there was a contract of that kind; think he said it was robbery. He said, "I don't like it, but I don't like to go back on anything my men do." Think he talked about some kind of a proposition. Tootle refused to pay it. He had no transactions with Landis or Bernard other than those testified to.

John C. Landis, Jr., an attorney at law, testified for plaintiff: During the time Bernard was secrtary for Tootle-Campbell Dry Goods Company, I looked after the legal matters that arose in the credit department.. The credit department looks after the credits and the sale of merchandise and after collections. In settlements and adjustments I dealt with Bernard. I occasionally discussed matters with T. B. Campbell. Bernard resigned about May, 1911. I made one trip to McAlester in July or August, 1910, to see Fuller about his account. The adjustment of that matter was consummated in the contract of December 12, 1910, but that contract was delivered some time later in December. I had transactions leading up to this settlement with G. W. Fuller, W. H.

Fuller, Mr. Gillis of Bradley-Metcalf Company and Bernard.

Mr. Bernard, called as a witness by defendant, testified: I was employed by defendant as secretary and credit man in 1908; I was instrumental in inducing Fuller to change his account from the Brittain Dry Goods Company. He owed that company about $14,000, and we furnished him goods which he sold and paid Brittain. In 1910, he owed defendant about $31,000. Fuller had left out of his financial statement the debt to his father of $28,500 and to his wife of $22,500. I knew nothing of these debts. I got after him to pay something on his account and he told me of these debts. I stopped selling him. I had Landis investigate, and he told me he was satisfied Fuller owed these debts. Landis commenced negotiations to incorporate this company. The capital stock, $40,000, was paid up with the assets of the W. H. Fuller Dry Goods Company. Fuller then owed the defendant notes for about $28,500 and an account of about $3500. I got stock to pay the notes and surrendered them. The $3500 was let stand as an open account. It was assumed by the Fuller Dry Goods Company. The remainder of the stock, $7,000, went to G. W. Fuller and $2400 to Bradley-Metcalf, and I think W. H. Fuller got one share. W. H. Fuller was made president of the company at $1800 per year. From the facts I knew, he was dishonest. I sent Mr. Wenn down to have charge of the buying and selling of goods. Tom Campbell was vice-president and manager of the Tootle-Campbell Dry Goods Company. He was only partially active during 1910. Mr. Tootle took an active part in the office at whatever time Campbell was sick. Tootle asked for a list of our large or unusual accounts. I gave it to him as soon as I could prepare it. I included the account of W. H. Fuller. Told him we had the corporation stock of the W. H. Fuller Dry Goods Company as security. Think I still carried the account books in the name of W. H. Fuller. I don't remember that Tootle brought W. H. Fuller over to talk over this matter, or that I told him

that I held the stock of the Fuller Dry Goods Company for the debt. I made a written report that the debt was still in the name of W. H. Fuller, and that I held the stock as collateral security for it. I testified in the Bradley-Metcalf suit that I told Tootle that the debt had not been paid and that I had simply taken the stock as collateral security. Tootle asked me for a copy of the contract which he ascertained had been entered into in December, 1910. I couldn't find it. Tootle was trying to get all the information he could regarding the account. I have no recollection of telling Tootle of the contract to buy Fuller's $7,000 stock. He was asking me specific questions about it. I should have given him all the information I had. I didn't tell any one connected with the Tootle Dry Goods Company that I gave up the notes to Fuller. The account remained on the books the same as it was before the deal. The stock of goods turned over by Fuller was appraised, but not invoiced. I testified on the last trial that the affairs of Mr. Fuller were in such a shape that in the event of a failure creditors would not get ten cents on the dollar. I had absolute charge of the credit department, not to sell goods, but to collect accounts. I would pass on sales, and if they wanted to they could take it to a higher officer. They never did. I only went to Mr. Campbell in an informal way. "Q. Did you talk to him in an informal way? A. No sir. Q. When you came to settle it, did you talk it over with him? A. To the best of my recollection, Mr. Campbell was not there." I did not consult with Mr. Tootle about it. I may have consulted with Mr. Tootle about things, but I cannot recall any one specific instance of doing so. I think we shipped W. H. Fuller goods up to the day of this incorporation, in small lots. I think Fuller's stock of goods was listed at $25,000 by Mr. J. A. Scott, a merchant, a customer of Tootle-Campbell and an acquaintance of mine. There was a purchase of a Smith-Bassler stock of goods or a portion of it at McCook. Scott and I did that. We took some merchandise that Smith-Bassler were overstocked on, and shipped it to

Fuller Dry Goods Company and gave credit to Smith-Bassler and charged it to Fuller Dry Goods Company. I did not consult Campbell or Tootle. Brinckman, at Parsons, Kansas, failed. Tootle-Campbell Dry Goods Company bought in his assets, and sold them to Scott. There were others brought from Tulsa, Oklahoma, where we were trying to operate a job lot store. That was all brought to Parsons, Kansas, where J. A. Scott took it and it was incorporated together. In entering into these Fuller contract, my purpose was to get the Tootle-Campbell Dry Goods Company the best possible out of that partnership. I thought, under proper management, it would make money and pay back what we had to give in order to keep it out of liquidation. I consulted with Mr. Landis in connection with this and other matters of this kind. Landis drew up these contracts in this case. That was my general custom in handling the credit department.

I do not remember having any of these papers on file in my office. I was credit man and it was my duty to pass on accounts and credits. When there would be a failure, either I, that is, Tootle-Campbell Dry Goods Company, or somebody else, would buy the stock in, and if I could, I would sell it back to him in bulk. "Q. Was there any other transaction of any kind while you were with Tootle-Campbell Dry Goods Company where you ever signed a contract obligating them to pay money to buy stock or pay a promissory note? A. I think this case here is the only one we had occasion to handle." . . . It was provided that all W. H. Fuller's debts were to be paid. All that Tootle-Campbell Dry Goods Company did not pay were to be paid from money coming from the Fuller Dry Goods Company after the incorporation. I don't know that we realized anything on the old accounts. It was not my duty as credit man to look after those collections; that was to be handled by W. H. Fuller. I sent Mr. Wenn down there after these contracts were executed on my own authority. Prior to this transaction, I had, as secretary, drawn drafts on the com-

pany, but had never signed a note. The drafts could be turned down if they saw fit. I think the drawing of the check was mentioned in the by-laws and the drawing of a draft was an assumed power. They turned down one of my drafts. I knew that you (R. A. Brown) were the general attorney for the company.

Mr. Reardon, who had been assistant credit man with the defendant from its incorporation in 1908, testified he knew about Tootle-Campbell Dry Goods Company selling goods to W. H. Fuller in Oklahoma; that it was his duty to take care of the book accounts, but he never knew anything about a new corporation having been formed in December, 1910, or about the W. H. Fuller notes having been surrendered and stock taken for the payment of those notes. The notes were taken August 20, 1910, for $28,429.38. There was a six per cent demand note taken January 9, 1911, for $3483.95, signed by W. H. Fuller Dry Goods Company, by W. H. Fuller, president. There is also an open account against the Fuller Dry Goods Company, which on May 1, 1911, amounted to $10,264.84. That does not include the note; that was paid before May 1, 1911.

The by-laws of the defendant, read in evidence, provide that the president and vice-president, the president and treasurer, or the president and secretary, or the vice-president and secretary, may borrow money and sign notes for the company, and all checks shall be signed by one of said officers.

Mr. Tootle, president of the defendant company, testified in substance: Prior to Campbell's illness, he, as often as two or three times a week, would ask Bernard about collections, outstanding and the like and Bernard would ask his advice about general conditions and with regard to the purchase of bankrupt stocks, about specific failures and the purchase of specific stocks. Bernard's acts were subject to the superior officers of the company. After such consultations, Bernard had bought bankrupt stocks or something of that kind in which the company was interested. He, as president of the company, as-

sumed charge of the defendant's business when Campbell was taken ill. Early in 1911 he asked Bernard for a list of the large debtors of the company, and was furnished a statement showing that W. H. Fuller owed the defendant $28,000 in notes and a further sum on open account. Bernard told him that Fuller still owed the defendant and he had taken the stock of the Fuller Dry Goods Company as collateral security. Tootle had never heard of this company. At Tootle's request, W. H. Fuller came to St. Joseph. When asked to make a payment on his indebtedness, Fuller told Tootle it had been settled and produced the contract of December 12, 1910. This was the first information Tootle had of its existence. The two then called on Bernard, who denied that he had made contracts to purchase the stock held by G. W. Fuller and the Bradley-Metcalf Company, and said they had taken preferred stock in payment of their claims. He said he had taken the stock of Fuller Dry Goods Company in settlement of Fuller's account. He, Tootle, had never heard of the contract of December 12, 1910, before this meeting with W. H. Fuller, which was in April, 1911. He told Fuller that he would not carry out the contract, nor have anything to do with the management of the business which the contract gave the defendant the right to do. He then, and at several other times, requested W. H. Fuller to arrange a meeting with his father, and finally, on February 22, 1912, plaintiff came to St. Joseph and met Mr. Tootle. At that time, Tootle had never seen the contract sued on in this case. He then told plaintiff he did not intend to carry out the contract. No adjustment of the matter was accomplished at this meeting. Tootle had the files of the company investigated and was unable to find any papers relating to the transaction except a copy of a letter to plaintiff and a letter to Bradley-Metcalf Company in Bernard's wallet in the credit vault. They found nothing in the company's files. The W. H. Fuller Dry Goods Company, after running about two years, went into bankruptcy, and defendant got about three cents on the dollar of its claim.

Plaintiff's instruction numbered 3 directed the jury to find for the plaintiff if they found from the evidence that Bernard had authority to sign the contract on behalf of the defendant.

The fourth instruction reads, in part:

"And if you find from the evidence that for several years, or in numerous business transctions, C. R. Bernard was permitted by the defendant, without objection and in his official capacity, to pursue a particular course of conduct, it may be presumed as between defendant and those dealing with it upon the basis of his authority to represent it that he has acted in conformity with instructions from those who have the right to control its operations. And in determining whether or not C. R. Bernard had authority to sign on behalf of defendant the instrument sued on you should consider the evidence, if any, as to the course of business pursued by the defendant and said Bernard while in its employ, the transactions actually conducted by him for the defendant, and the authority actually exercised by him in dealings between the defendant and others. And you are further instructed that the plaintiff was not bound in his dealings with said defendant by the terms of any by-laws of said defendant, unless he had notice thereof, but he was entitled, in the absence of such notice, to rely upon the apparent authority vested in said Bernard by such course of business, if any, provided such apparent authority was exercised in a matter within the general scope of said Bernard's employment."

The plaintiff, a banker in Kansas City, met Bernard and Landis at his office in November, 1910. They were strangers. All plaintiff knew about them was that Bernard claimed to be defendant's secretary and credit man and that Landis claimed to be its attorney. He was not satisfied to have the contract for the purchase of his stock signed by Landis, but insisted that it be signed by the proper officer of the company. The burden is on the plaintiff to prove Bernard's authority. [Scotland County Bank

*Agent's Apparent Authority.*

v. Hohn, 146 Mo. App. 699, 704.] Respondent does not contend that Bernard, as secretary and credit man, had such authority.

On the question of his agency, the third instruction directed the jury to "consider the evidence, if any, as to the course of business pursued by the defendant and Bernard while in its employ, the transactions actually conducted by him for the defendant and the authority actually exercised by him in dealings between the defendant and others," whether, we may add, known to the defendant's officers or not. This instruction is predicated upon the theory that the defendant is estopped by matter *in pais,* from denying the authority of Bernard to execute the contract.

There is absolutely no evidence in the record that Bernard ever did another act so admittedly beyond the apparent scope of his duties as secretary and credit man. The signing of this obligation without the concurrence of some other officer of the company was clearly prohibited by the by-laws. Bernard testified, without contradiction, that this was the only case of the kind he ever handled and he studiously concealed this from his superior officers. Even Mr. Reardon, the assistant credit man, was profoundly ignorant of it. There is no evidence that tends to prove a course of business which would amount to a holding out to the plaintiff or any one else that Bernard had authority to execute a contract of this character. As said by Judge MARSHALL: "Moreover, no act of an agent will estop the principal unless it is brought home to his knowledge or repeated so often that notice to the principal is implied from his having taken the benefit of such act, and the act of the agent must be within the scope of the agent's duty, or within the scope of the duties the principal has held out the agent to have power to perform." [Sanders v. Chartrand, 158 Mo. 352, 362; 31 Cyc. 1219 (C).]

Apparent or ostensible agency is really agency by estoppel, and it is more strictly accurate to say that liability arises for the acts of such so-called agent, not

because there is any agency, but because the principal will not be permitted to deny it. [31 Cyc. 1236; St. Louis Gunning Adv. Co. v. Wanamaker, 115 Mo. App. 270.] The plaintiff was a man of experience and was put upon inquiry as to the authority of Bernard to bind his principal. He dealt with him at his peril. This is clearly illustrated in a case holding that the payee of a bank check must take notice that a cashier cannot pay his personal debt with funds of a bank. [St. Charles Savings Bank v. Edwards, 243 Mo. 553 (6).]

The plaintiff accepted a contract by which the defendant's secretary and credit man undertook, in effect, to bind his principal to pay plaintiff's son's debt of $7,000. He avers in his petition that his son was insolvent. He was willing to postpone payment of the debt of $28,500 due from his son and the debt of $22,500 due his son's wife, if only he could secure the contract for the purchase of his stock, which he admits was worthless at the time the suit was brought. Plaintiff is assumed to have known that such an act was beyond the scope of Bernard's authority. The evidence fails to show that any of the defendant's officers had any notice, express or implied, of this or any other similar action on the part of its credit man, and it cannot be found from the evidence in this case that they had ever held him out as having any such authority. On the contrary, as soon as the defendant's president learned of this contract, from whom it had been studiously concealed, he promptly repudiated the unauthorized act. There was clearly no evidence authorizing the giving of these instructions, nor for the submission of the case to the jury.

There are other questions discussed in the briefs of learned counsel which need not be considered. The judgment is reversed and the cause remanded. All concur.