T. P. SHUMAKE (PLAINTIFF), RESPONDENT, v. BASIC METALS MINING
CORPORATION, A CORPORATION, AND M. C. RHODES, DEFENDANTS,
BASIC METALS MINING CORPORATION, A CORPORATION (DEFEND-
ANT), APPELLANT.—129 S. W. (2d) 36.

St. Louis Court of Appeals. Opinion filed June 6, 1939.

Motion for rehearing overruled, June 20, 1939.

*Wm. H. Allen* for appellant.

*Brown & Frank* and *Harry A. Frank* for respondent.

BENNICK, C.—This is an action in eight counts by which plaintiff, T. P. Shumake, the former superintendent of defendant Basic Metals Mining Corporation (then known as Ozark Lead Mining Corporation), has sought to recover from the mining corporation and defendant M. C. Rhodes, its president, certain sums by way of salary and wages alleged to have been earned by plaintiff and some seven of his fellow employees in protecting and conserving the mining corporation's properties at Annapolis, Missouri, for the period from December 17, 1931, when the corporation filed its voluntary petition in bankruptcy and was adjudicated a bankrupt by the United States District Court for the Eastern Division of the Eastern Judicial District of Missouri, until May 24, 1932, the date of the appointment of the trustee in bankruptcy.

By the first count of his petition plaintiff sought to recover the salary due him, computed at the rate of $250 a month, under a contract of employment allegedly entered into with defendants on December 18, 1931, the day following the mining corporation's adjudication in bankruptcy.

By the second count of his petition he sought to recover, as assignee of one Hawkins, the salary due the latter, computed at the rate of $150 a month, under a contract of employment allegedly entered into by Hawkins with defendants at the time and under the conditions as set forth in the first count with respect to plaintiff's own employment.

By the six remaining counts of his petition he sought to recover, as assignee of certain laborers, Kimmel, Ivester, Amos Jenkins, Winfred Shumake, Duncan, and Raymond Jenkins, respectively, the wages due them, computed at specified rates per hour, under alleged contracts of employment by defendants for services to be performed by said laborers within the period covered by plaintiff's own employment.

The joint answer of defendants, after certain formal admissions with respect to the institution and prosecution of the bankruptcy proceeding, was a general denial, followed by the allegation that during the pendency of the bankruptcy proceeding, plaintiff and each of his assignors had filed their respective claims in said proceeding for the services alleged to have been performed by each of them during the periods referred to in the petition; that while their respective claims were pending and undisposed of, plaintiff and each of his assignors, on February 10, 1933, for a valuable consideration, had assigned to defendant Rhodes, as agent for persons who were then undertaking to refinance the mining corporation, all of their right, title, and interest in and to any and all claims that each of them had against the

mining corporation or its bankrupt estate; that thereafter plaintiff and each of his assignors caused to be presented to the bankruptcy court a writing signed by each of them along with other creditors of the bankrupt, declaring their willingness that the adjudication in bankruptcy be set aside and the bankruptcy proceeding discontinued and dismissed in accordance with the bankrupt's motion for the dismissal of the proceeding, in which motion it was alleged that the claims of plaintiff and each of his assignors now sued upon in this action had been settled and the same assigned so that they no longer constituted claims against the mining corporation or its bankrupt estate; and that as a result of the foregoing, neither plaintiff nor any of his assignors had a claim or cause of action against defendants, or either of them, for or on account of the matters alleged in the several counts of the petition, and were estopped to assert any such claim or cause of action.

The reply was in the conventional form.

Tried to the court alone without the aid of a jury, judgment was entered in favor of plaintiff, and against defendant Basic Metals Mining Corporation, upon counts 1, 2, 3, 4, 6, and 7 of the petition for the aggregate sum (including principal and interest from May 24, 1932) of $2,782.84; in favor of defendant Basic Metals Mining Corporation, and against plaintiff, on counts 5 and 8 of the petition (having to do with the assigned claims of Amos Jenkins and Raymond Jenkins, who, on March 2, 1936, had written plaintiff's attorney that upon further investigation they had found that their respective claims theretofore filed through plaintiff had been in error); and in favor of defendant Rhodes, and against plaintiff, on all the counts of the petition.

From the judgment so entered, the appeal of defendant Basic Metals Mining Corporation has been brought to this court in the usual course.

The mining properties in question were originally owned by a corporation known as Annapolis Lead Company, which became heavily indebted, and, being unable to meet its maturing obligations, lost its properties through the foreclosure by its bondholders of a mortgage or deed of trust upon the properties securing payment of the bonds. Thereafter, on October 24, 1931, certain of such former bondholders incorporated a new company under the name of Ozark Lead Mining Corporation, which thereupon acquired title to the properties and continued to hold the same, though without at any time engaging in actual mining operations, until December 17, 1931, when it filed a voluntary petition in bankruptcy and was adjudicated a bankrupt. The bankruptcy proceeding thus instituted remained pending until September 9, 1933, when, with no creditor appearing in objection or opposition to the bankrupt's motion theretofore filed to set aside the adjudication and dismiss the proceeding, the court sustained the motion and ordered that the funds of the bankrupt in the hands of the trustee in bankruptcy, who, as we have already indicated, had been appointed on

May 24, 1932, should be paid over by him to the corporation, which shortly thereafter changed its name to Basic Metals Mining Corporation, by which name it has since continued to be known.

Treating all conflicts in the evidence as having been resolved in plaintiff's favor by the finding and judgment of the court, it appears that in the early afternoon of December 18, 1931, the day after the mining corporation's adjudication in bankruptcy, plaintiff and Hawkins, acting in response to a request from Rhodes, the president of the corporation, met the latter at Chloride, Missouri, a village located eight miles south of Ironton, and in the course of the conference between them on that occasion were employed by Rhodes, in his capacity as president of the bankrupt corporation, to continue indefinitely on the job at their former salaries for the purpose of protecting and preserving the properties of the corporation which Rhodes was then undertaking to refinance.

On the same day (perhaps later in the afternoon after his return to St. Louis) Rhodes wrote plaintiff a letter, purportedly signed by the corporation by himself as president, in which he stated that such letter would be plaintiff's authority to take from underground the mules, cars, locomotive, batteries, pumps, motors, drills, shovels, picks, explosives, hoists, and equipment and supplies of all kinds that would be damaged by the water, and in which he also suggested that it would be well for plaintiff to plug up and cement large water holes where considerable water was coming in, inasmuch as such protection at that time would put the new owners of the property to less expense of pumping out the water than would be the case if the water were allowed to come in without restraint.

Four days later Rhodes again wrote plaintiff to the same general effect as before, and in the course of the letter authorized plaintiff to employ additional men to assist in removing the properties and equipment from underground, for which purpose he advised plaintiff that he was sending down the sum of $130 to be applied towards payment of the expenses of the work. Plaintiff testified that the sum of $130 was transmitted to him in the form of currency, and that it was all used by him in payment for labor, though not in payment of any of the claims sued on in this action.

On December 24, 1931, in conformity with the directions theretofore given by Rhodes, plaintiff and those assisting him removed fourteen mules from underground and put them in a shed on the premises where they were kept and cared for until a purchaser procured by Rhodes subsequently called and took them away. Some weeks later plaintiff and the men working with him, including his assignors in this case, salvaged the motors of all sorts, the storage batteries, underground drills and drill machinery, air hose connections, shovels, sledges, picks, harness for the mules, and, in fact, everything in the way of equipment which was underground and could be brought up

on a ladder, the hoists not being available on account of the fact that the boiler and engine, due to lack of fuel, were not in operation at the time. Save for the removal of the mules, which had had to be taken out of the mines before high water would reach them, the greater part of the salvaging was done in February and March of 1932, the work being carried on in several different "pitches" which comprised, in their entirety, a period of about thirty days. After the removal of the equipment from underground had been completed, plaintiff undertook repair work on the fences and houses on the premises, and, in addition, from February until May 24, 1932, when the trustee in bankruptcy was appointed and took charge of the properties, he and Hawkins worked regular shifts of twelve hours each making rounds over the premises in the place of the watchmen who had been laid off at the first reduction in force.

There was still other evidence of frequent communications, both oral and written, between plaintiff and Rhodes over the period of time during which the services now in question were being rendered, all indicative of the fact that Rhodes was at all times aware that the work of salvaging and preserving the mining corporation's properties and equipment was being carried on according to his directions, and that plaintiff and the other men assisting him on the job expected to be paid for what they were doing.

Not only were plaintiff and his several assignors purportedly employed on behalf of the mining corporation after December 17, 1931, the date of its adjudication as a bankrupt, but they had also been employed by it prior to such adjudication, and on or about May 9, 1932, each of them filed a claim for the salary or wages due him from the corporation as of the date of bankruptcy. There is of course no question about such claims having been provable in the bankruptcy court, and being in nowise involved in this action, they are to be distinguished from the claims now sued on, which, as we have already pointed out, are for salaries and wages allegedly earned for beneficial services rendered after December 17, 1931, the date of the adjudication in bankruptcy, and until May 24, 1932, the date of the appointment of the trustee in bankruptcy.

So far as the latter claims are concerned, it appears that on January 11, 1933, plaintiff and his several assignors filed in the bankruptcy court their separate petitions for specific allowances for beneficial services rendered to the bankrupt estate, which petitions had been prepared for them by the attorney for the bankrupt. The amounts so claimed were identical with the respective amounts sued for in this action, save only that the claims filed in the bankruptcy court were necessarily based upon the theory of the reasonable value of the services rendered, while in this action the petition proceeds upon the theory of express contracts of hiring.

It is important to bear in mind that no action was ever taken in the bankruptcy court towards either the allowance or rejection of the claims for beneficial services, nor, in fact, does appellant contend that any such action was taken by the court, but only that prior to the dismissal of the bankruptcy proceeding, the claims were settled and assigned by the respective claimants, so that at the time of the institution of this action plaintiff and his assignors had no claims against the mining corporation, and were estopped to assert to the contrary.

Such defense grows out of certain steps that were taken at the instance of appellant and Rhodes, its president, with a view to procuring the assent of plaintiff and the other employees to the dismissal of the bankruptcy proceeding.

On April 25, 1932, the bankrupt mining corporation filed its first motion to dismiss the proceeding, which motion was thereafter overruled by the court on May 16, 1932, eight days before the election and appointment of the trustee in bankruptcy. Even at the time of the filing of this motion Rhodes had written plaintiff soliciting his assistance in the matter of procuring the signatures of his fellow claimants to a paper purporting to evidence their joinder with the bankrupt itself in requesting the dismissal of the proceeding.

So matters stood until the early part of 1933, when Rhodes, again seeking to lay the foundation for securing a court order setting aside the adjudication in bankruptcy, had plaintiff and his assignors execute the assignments which are now relied upon as the basis for the defense that the claims sued on by plaintiff were settled and assigned prior to the institution of this action upon them.

By each of such instruments the particular claimant purported to assign to Rhodes all his right, title, and interest in and to any and all claims he might have against the mining corporation or its bankrupt estate, followed, however, by a specific statement or identification of the total of the claim assigned, which, incidentally, embraced only the amount of the particular employee's claim on file for salary or wages earned prior to December 17, 1931, the date of bankruptcy, and did not include the employee's claim for beneficial services rendered after such date. Furthermore it appears that the settlement thereafter made was on a percentage basis of the respective amounts stated in such assignments; and plaintiff's evidence was to the effect that at the time such settlement was made Rhodes promised to pay the claims now sued on, that is, the claims for beneficial services rendered after bankruptcy, within sixty days after the bankruptcy proceeding should be dismissed.

Thereafter, on July 5, 1933, appellant prepared and filed in the bankruptcy court a second motion for the dismissal of the proceeding, to which was attached a list of the creditors of the bankrupt estate.

In one paragraph of the motion it was recited that certain claims of wage earners had been theretofore settled and assigned, so that

such claims no longer constituted claims against the bankrupt estate. These claims, of course, were the claims that had been assigned to Rhodes early in 1933, and were the claims for salaries and wages earned prior to December 17, 1931, the date of bankruptcy, and not the claims now involved in this action for beneficial services rendered after such date. Indeed in the list of claims attached to the motion the claims for beneficial services now sued on were separately and distinctly stated by counsel for the bankrupt, and where the motion was in error, at least under plaintiff's version of the facts, was in its representation to the court that such claims had likewise been settled and assigned, when the truth of the matter was, if plaintiff's evidence was to be believed, that the assignments had been intended to cover only the claims for salaries and wages earned prior to bankruptcy.

In urging its defense appellant also points to the fact that plaintiff and his assignors signed a paper, identified in the record as defendants' Exhibit A, in which, after representing themselves as creditors of the mining corporation for the amounts set opposite their signatures appearing at the foot of the document, they expressed themselves as willing that the proceedings in bankruptcy be discontinued and that the adjudication in bankruptcy be set aside. This paper was signed in July, 1933, apparently about the time of and in connection with appellant's second motion to dismiss, which, it will be recalled, was filed on July 5, 1933, long after the execution of the assignments which had taken place in January and February of 1933. However, as regards the applicability of defendants' Exhibit A to the defense now urged, it is of importance to note that the amounts set opposite the signatures of the signers of the document were the amounts of the claims for salaries and wages due for services rendered prior to December 17, 1931, the date of the adjudication in bankruptcy, and did not include the amounts claimed for beneficial services rendered to the mining corporation after such date. Indeed the bankrupt's own attorney, who had prepared defendants' Exhibit A for the signatures of the claimants whose names appeared to it, testified in the trial of the case that such exhibit had had nothing to do with the petitions for beneficial services, and, in fact, that it had not even been formally filed in the bankruptcy proceeding, although it was presented to the court at the time the motion to dismiss was heard.

But at any rate, the consequence was that plaintiff and the other claimants, presumably believing that their claims for services rendered after bankruptcy would be taken care of by appellant after the dismissal of the proceeding, interposed no objection to the latter's motion to dismiss, so that the court, naturally assuming from the representations in the motion and the lack of objection or opposition thereto that there were no valid debts or claims remaining unpaid, sustained the motion, and ordered that the adjudication in bankruptcy be set aside and the proceeding dismissed, and that the funds in the hands

of the trustee in bankruptcy be paid over forthwith to appellant. It happened, however, that after the dismissal of the bankruptcy proceeding had been secured, payment of the claims in question was refused by appellant, and this action was thereafter instituted upon them, resulting, as we have already indicated, in a finding and judgment for plaintiff, from which appellant, the mining corporation, has taken its appeal to this court.

In support of its assignment that the court erred in its finding and judgment for plaintiff, appellant argues the point to which we have heretofore given some attention, that is, that plaintiff, both for himself and as the assignee of the other claimants, is estopped as a matter of law from now asserting any claim against appellant for or on account of the services alleged in the several counts of the petition. This contention has in effect been ruled against appellant in connection with the statement of the facts of the case. We have already pointed out that there was conflicting evidence upon the question of what claims were intended to be settled and assigned, as well as upon the question of the significance to be attached to the fact that plaintiff and his assignors joined with appellant in requesting, or at least in offering no opposition to appellant's request, that the bankruptcy proceeding be dismissed. If plaintiff's evidence is to be believed, appellant was in nowise deceived by any action taken on the part of plaintiff and his assignors, but on the contrary, if there was deception practiced, which we are not undertaking to say, plaintiff and his assignors were the ones deceived with respect to the disposition which was to be made of their claims for services concededly rendered in some degree. Suffice it at least to say that on conflicting evidence the question of the application of the assignments and of the effect of the action of plaintiff and his assignors in joining with appellant in the request for the dismissal of the bankruptcy proceeding was for the trier of the facts to determine, and the finding made, having been based upon substantial evidence, is binding and conclusive upon us to the extent that such question is in issue on this appeal.

This brings us then to a consideration of the question which we think is decisive of the appeal, the same being the question of whether Rhodes, as president of the corporation, had the authority, during the pendency of the bankruptcy proceeding, to make and bind the corporation by such express contracts of employment as are alleged and sued on by plaintiff in this case.

It is not claimed or even suggested by plaintiff that Rhodes had been specially authorized by the corporation's board of directors to enter into the contracts in question, so that if the authority existed, it was necessarily to be derived from his implied power as the chief executive officer of the corporation to perform any and all acts of an ordinary nature which, by usage and necessity, were incident to his office, and to bind the corporation by contracts in matters arising in

the usual and ordinary course of the corporation's business. [Sparks v. The Dispatch Transfer Co., 104 Mo. 531, 15 S. W. 417; Bacon Piano Co. v. Wilson (Mo. App.), 62 S. W. (2d) 774; Concrete & Steel Construction Co. v. National Asphalt Refining Co. (Mo. App.), 2 S. W. (2d) 157; 14a C. J. 423; 13 Am. Jur., Corporations, sec. 898.]

Though the question, in all its aspects, has been one of no small concern to us, we nevertheless cannot escape the conclusion that the contracts entered into by Rhodes, having been made after the adjudication in bankruptcy, and having related solely to matters having to do with the estate in existence at the time of bankruptcy, are in no sense to be regarded as having been made in the usual and ordinary course of the corporation's business so as to have become valid and binding obligations on the part of the corporation.

We appreciate the fact that appellant's adjudication as a bankrupt did not work a dissolution of the corporation or the loss or forfeiture of its charter, and that notwithstanding its bankruptcy, its officers and directors continued in office for the purpose of maintaining the corporate existence of the company and protecting its interests throughout the course of the bankruptcy proceeding. [8 C. J. S., Bankruptcy, sec. 488.] Nor are we unmindful of the fact that pending the appointment and qualification of the trustee, the corporation was left with a defeasible title to the property, pursuant to which it thereafter held the bankrupt estate in trust for the benefit of its creditors, though subject to the jurisdiction of the bankruptcy court, which acquired jurisdiction over the corporation's property and asserts upon the filing of the petition. [Johnson v. Collier, 222 U. S. 538, 56 L. Ed. 306, 32 S. Ct. 104; Gordon v. Mechanics' & Traders' Ins. Co., 120 La. 441, 45 So. 384; Rand v. Iowa Cent. R. Co., 186 N. Y. 58, 78 N. E. 574; Christoperson v. Harrington, 118 Minn. 42, 136 N. W. 289; 6 Am. Jur., Bankruptcy, sec. 188; 8 C. J. S., Bankruptcy, sec. 140.]

The color of right in plaintiff's claim is of course due to the fact that the contracts in question were for services rendered by plaintiff and his assignors in preserving and protecting the property in the *interim* between the adjudication in bankruptcy, and the appointment and qualification of the trustee, during which period, as we have pointed out, appellant continued to hold title to the property, though in trust for the benefit of its creditors. We are convinced, however, that even though the services rendered were undoubtedly beneficial in character, that fact did not serve to bring them within the category of the usual and ordinary business of the corporation so that Rhodes, by virtue of his implied authority as president of the corporation, could have bound the latter to express contracts for their performance.

The truth of the matter is that appellant, after bankruptcy, was in no sense conducting its usual and ordinary business as a mining corporation, and this regardless of the fact that its financial condition had seemingly been such as to have prevented it from mining and

selling ore at any time during the few weeks of its existence preceding bankruptcy. Nor, indeed, would it have been possible for it to have carried on its usual and ordinary business after bankruptcy and after its property and assets had passed into the custody and control of the bankruptcy court with a view to the possible settlement and distribution of the estate, unless it had in some manner acquired new mining properties after the date of bankruptcy, which, by reason of constituting no part of its bankrupt estate, would have been free from the claims of creditors and the control of the bankruptcy court.

Conceding that appellant, pending the appointment and qualification of the trustee, did continue to hold the property in trust for its creditors, it would seem that the only measure of its obligation was to do nothing in derogation of the bankruptcy estate, and that after the adjudication it was in no manner bound to care for and preserve the property at its own expense. Quite to the contrary, the primary duty of protecting and preserving the property rested with the bankruptcy court in whose custody and control it was (In re Mitchell (C. C. A. N. Y.), 278 Fed. 707, 709), and the actual and necessary cost of preserving the estate subsequent to the filing of the petition was properly a charge of the first order, not against appellant, but against its bankrupt estate. [11 U. S. C. A., sec. 104(b).] It would appear, therefore, that the inclusion in the Bankruptcy Act of the provision according priority to a debt representing the actual and necessary cost of preserving the estate subsequent to the filing of the petition excludes the idea that it could be any part of the usual and ordinary business of a corporation in bankruptcy to enter into express contracts for the performance of such duties as a charge against itself, and so we think the inevitable conclusion is that to whatever extent appellant's trusteeship imposed a duty upon it in that regard, such duty could have extended no further than to make whatever arrangements it might for the preservation and safeguarding of the property with any person or persons who might be willing to undertake the rendition of such services and to look to the bankruptcy court for the payment of the actual and necessary cost of their work.

Plaintiff suggests, however, that appellant, in its answer, did not affirmatively plead that either it or Rhodes as its president had lacked the power and authority to have entered into the express contracts sued on in this case, and that it is only in this court that appellant urges the defense of lack of power and authority. Suffice it to say as to this that appellant, by a general denial, put in issue the whole question of its liability on the contracts, and that in so far as the question of the burden of proof was concerned, the burden was upon plaintiff, who was seeking to hold appellant liable upon the contracts of Rhodes, its president, to show that Rhodes had possessed the authority to bind the corporation by such contracts. [Fidelity National Bank & Trust Co. v. Tootle-Campbell Dry Goods Co., 293

Mo. 194, 238 S. W. 474; First National Bank of Elyria v. The Equipment Co., 221 Mo. App. 733, 285 S. W. 779.]

The point is also made that appellant should in any event be held liable upon the theory that it received and accepted the benefits of the performance of such contracts. Undoubtedly it did ultimately receive the benefits of the actual and necessary work for which plaintiff and his assignors might have had reasonable compensation in the bankruptcy court, but the trouble is that even if it might otherwise have been held liable, there could obviously be no recovery in *quantum meruit* in this action, which is founded purely upon express contracts of hiring.

Plaintiff's burden was to establish the causes of action embraced in the several counts of his petition by proof of valid express contracts constituting binding obligations on the part of appellant corporation, and having failed in this in the respects pointed out, it follows that the judgment rendered by the circuit court should be reversed. The Commissioner so recommends.

PER CURIAM:—The foregoing opinion of Bennick, C., is adopted as the opinion of the court. The judgment of the circuit court is, accordingly, reversed. *Hostetter, P. J.,* and *Becker, J.,* concur; *McCullen, J.,* absent.